# UNITED STATES DISTRICT COURT

### for the

### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the*<br>*person by name and address)*<br><br>THE PREMISES LOCATED AT 19323<br>REDBRIDGE LANE, TARZANA, CA 91356 | )<br>)<br>)<br>)<br>)<br>)    Case No. 2:20-mj-3224 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1001 | False Statements |
| 18 U.S.C. § 1028(a)(7) | Identification Fraud |
| 18 U.S.C. § 1621 | Perjury |
| 49 U.S.C. § 46317(a) | Flying Without a Certificate |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Cristina Jones*
_____
*Applicant's signature*

Cristina Jones, DOT-OIG Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>      Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

AUSA: <u>Scott D. Dubois (x0882)</u>

## ATTACHMENT A-1

PREMISES TO BE SEARCHED

The premises located at 19323 Redbridge Lane, Tarzana, CA 91356 (the "SUBJECT PREMISES").

The SUBJECT PREMISES is a two-story, 4,928 square feet, five bedroom, seven bathroom home located inside the Mulholland Park gated community.  The SUBJECT PREMISES includes any garages, locked cabinets, safes, or other storage containers, the curtilage, any outbuildings, and any vehicles parked in any garages or driveways of the SUBJECT PREMISES.

**ATTACHMENT B**

## I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1001 (False Statements), 18 U.S.C. § 1028(a)(7) (Identification Fraud), 18 U.S.C. § 1621 (Perjury), and 49 U.S.C. § 46317(a) (Flying Without a Certificate) (collectively, the "Subject Offenses"), namely:

a.   Records, documents, programs, applications or materials, or evidence of the absence of same, dated from January 1, 2016, through the present referencing or reflecting the advertising or operation of charter flights operated by Nicolas Steele ("STEELE"), Lilia Steele ("LILIA"), MC Aviation, Steele Aviation, Inc., Steele Aviation Group LLC, and Kiwijet LLC, or any other business entity associated with STEELE or LILIA (collectively, the "Target Companies"), including contracts, correspondence, purchase orders, invoices, bills of sale, processing documents, charter rates/quotes, accounts receivable and payable, financial records, internal notes, receipts, memoranda, phone records, telephone messages, minutes, diaries, certificates of conformance, airworthiness approval records, work orders, work scopes, work order logs/cards, flight and maintenance logs, fuel logs, weight and balance graphs/records, material control forms, operation specifications, leasing records, pilot medical and training files, fixed wing aircraft maintenance records, insurance

records, inspection reports, air carrier certificates, status
reports, and other FAA-related documents;

b.    Records, documents, programs, applications or
materials, or evidence of the absence of same, created from
January 1, 2016, through the present referencing or reflecting
the Part 135 status of the Target Companies or advertising,
advising, warning, or informing customers or potential customers
of the Part 135 status of any of the Target Companies;

c.    Records, documents, programs, applications or
materials, or evidence of the absence of same, referencing or
reflecting flights operated or crewed by STEELE or Christian
Monthy ("MONTHY") from December 4, 2017, through April 2, 2018,
and April 26, 2019, through the present, including calendars,
flight plans, travel itineraries, maps, airline ticket, baggage
check stubs, frequent use club membership information, airline,
hotel and rental car receipts, credit card bills and receipts,
photographs, videos, passports, and visas;

d.    Records, documents, programs, applications or
materials, or evidence of the absence of same, created from
January 1, 2016, through the present referencing or commenting
on FAA regulations concerning fixed wing aircraft, fixed wing
aircraft operations, and pilot certification, including, but not
limited to, correspondences, orders, publications, advisory
circulars, airworthiness directives, contracts, regulations, and
certifications;

   e. Records, documents, programs, applications or materials, or evidence of the absence of same, referencing or reflecting STEELE's citizenship status;

   f. Records, documents, programs, applications or materials, or evidence of the absence of same, referencing or reflecting any alias or false personal identifying information used by STEELE;

   g. United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

   h. Records, documents, programs, applications or materials, or evidence of the absence of same, created from January 1, 2016, through the present referencing or reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with others involved in the planning, coordination, advertising, solicitation, operation, or funding of any charter flight, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, documents noting price, numbers, and/or times when passengers were transported

whether contained in hard copy correspondence, notes, emails,
text messages, photographs, videos (including items stored on
digital devices), or otherwise;

        i.   Records, documents, programs, applications or
materials, or evidence of the absence of same, created from
January 1, 2016, through the present referencing or reflecting
the identity of, contact information for, communications with,
or times, dates or locations of meetings with customers and
prospective customers of charter flights operated by STEELE,
LILIA, or the Target Companies, or in which STEELE, LILIA, or
the Target Companies were involved, including calendars, address
books, telephone or other contact lists, pay/owe records,
distribution or customer lists, correspondence, receipts,
records, and documents noting price, numbers, and/or times when
passengers were transported whether contained in hard copy
correspondence, notes, emails, text messages, photographs,
videos (including items stored on digital devices), or
otherwise;

        j.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

        k.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written

communications sent to or received from any of the digital
devices and which relate to the Subject Offenses;

l.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the Subject Offenses;

m.   Audio recordings, pictures, video recordings, or
still captured images referencing or reflecting any of the
Subject Offenses;

n.   Contents of any calendar or date book from
January 1, 2016, to the present;

o.   Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations from
January 1, 2016, to the present;

p.   Any digital device which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offenses, and forensic copies thereof;

q.   With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

i.   evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,

configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

        v.    evidence of the times the device was used;

        vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

        vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or

seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital
device, encounters immediately apparent contraband or other
evidence of a crime outside the scope of the items to be seized,
the team shall immediately discontinue its search of that device
pending further order of the Court and shall make and retain
notes detailing how the contraband or other evidence of a crime
was encountered, including how it was immediately apparent
contraband or evidence of a crime.

d.   If the search determines that a digital device
does not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device
does contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

f.   If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the list of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

g.   The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),

ix

including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, law enforcement is permitted to: (1) depress STEELE's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of STEELE's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Cristina Jones, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for a warrant to search 19323 Redbridge Lane, Tarzana, CA 91356 (the "SUBJECT PREMISES") as described more fully in Attachment A-1, and the person of Nicolas Steele ("STEELE") as described more fully in Attachment A-2.

2.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1001 (False Statements), 18 U.S.C. § 1028(a)(7) (Identification Fraud), 18 U.S.C. § 1621 (Perjury), and 49 U.S.C. § 46317(a) (Flying Without a Certificate) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF SPECIAL AGENT CRISTINA JONES

4.    I am a Special Agent with the United States Department of Transportation, Office of Inspector General ("DOT-OIG"), and have been so employed since July 2019. Previously, I was a Special Agent with the United States Department of Labor, Office of Inspector General, from February 2018 to July 2019. I am assigned to the Western Regional Office in Cerritos, California, where I investigate matters concerning violations of Title 18 and Title 49 of the United States Code.  As a DOT-OIG Special Agent, I am responsible for investigating various types of fraud and safety violations related to DOT programs.

5.    I have completed three months of training at the Federal Law Enforcement Training Center in Brunswick, Georgia. During my employment as a DOT-OIG Special Agent, I have participated in investigations related to transportation safety, wire fraud, mail fraud, fraud against DOT programs, and various other DOT-related violations.  I have participated in various aspects of criminal investigations, including bank-record analysis, electronic surveillance, physical surveillance, search warrants, arrests, and reviewing evidence from digital devices.

## III. SUMMARY OF PROBABLE CAUSE

6.    STEELE falsified citizenship information on at least ten forms filed with the Federal Aviation Administration ("FAA"), and opened at least one bank account using a false social security number.  Since at least 2016, STEELE has advertised his aviation companies as holding the necessary FAA certifications and has conducted for-hire flights without a

2

valid FAA certificate.  STEELE has also defrauded other aviation companies and lied under oath during a bankruptcy hearing, where STEELE denied involvement in his current aviation company Kiwijet LLC.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

7.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following.

**A.    Federal Aviation Regulations**

8.   The FAA is an agency within the United States Department of Transportation responsible for the regulation of civilian aviation matters in the United States and its possessions.  The FAA has issued regulations that govern all civilian aviation activities within the United States.  The primary concern of the FAA with regard to civilian matters is safety.

9.   Pilots must obtain an airman's certificate by the FAA. As part of the process, pilots must fill out an Airman Certificate and/or Rating Application, called a Form 8710-1. These forms are submitted when an individual first wants to become a pilot and then every time the pilot seeks a rating for a specific type of aircraft.  The FAA uses the Form 8710-1 as part of its basis for issuing an airman's certificate or type rating (<u>i.e.</u>, a certification to fly certain types of aircraft). The Form 8710-1 includes a pilot's certification that all statements and answers on the form are complete and true to the best of the applicant's knowledge and an agreement that the

3

applicant's statements and answers are to be considered as part
of the basis for issuance of any FAA certificate.

10.   Part 135 of the Federal Aviation Regulations provides
operating and safety requirements for on-demand commercial
operations.  Part 135 generally applies to charter flights and
commercial flights operated for hire.  Because Part 135
operations involve more flights with a greater number of
passengers, the applicable rules are stricter than those
governing private flights.  The FAA issues Part 135 certificates
to operators only after a rigorous application process, which
requires, among other things, that applicants develop
comprehensive operating, training, and maintenance manuals
governing their charter operations.

11.   Under Title 14, Code of Federal Regulations, Section
119.33, a person may not conduct any commercial passenger or
cargo aircraft operation for compensation or hire under Part 121
or Part 135 unless that person is: (1) a citizen of the United
States, (2) obtains an operating certificate, and (3) obtains
the applicable operations specification that prescribes the
authorizations, limitations, and procedures for each particular
type of operation.

**B.   False Statements on STEELE'S Airman Certificate**

12.   On August 9, 2019, I received from the FAA a certified
copy of STEELE's airman file.  The earliest approved Airman
Certificate and/or Rating Application (Form 8710-1) for STEELE
is dated December 7, 1994.

13.   Between 1994 and 2017, Steele submitted ten Forms
8710-1 to the FAA.  STEELE signed each application, thereby
certifying that all statements on the forms were complete and
true to the best of his knowledge.  On all ten Forms 8710-1,
STEELE answered that his place of birth was "Los Angeles, CA"
and that his Nationality was "USA."

14.   On July 26, 2019, I learned from a Department of State
database that STEELE was born in New Zealand and last entered
the United States on a B1/B2 visitor's visa on May 21, 2001.

15.   I have since learned that STEELE was an informant for
Homeland Security Investigations ("HSI"), which granted him
parole inside the United States.  In approximately March 2018,
HSI also granted STEELE a work visa and a permit to travel, both
valid for one year.  STEELE applied with United States Customs
and Immigration Service to become a lawful permanent resident
and, in December 2018, STEELE was granted prima facie
eligibility by USCIS, indicating that his application will
likely be approved.  However, HSI Special Agent Troy Thompson
confirmed that, as of December 2019, STEELE has not yet been
granted citizenship and that parole does not permit one to
change birthplace or citizenship information.

C.   **STEELE's Companies**

16.   Based on public records from the Nevada and California
Secretaries of State, STEELE is listed as an executive officer
for two aviation companies: Steele Aviation, Inc. ("Steele
Aviation") and Steele Aviation Group LLC ("Steele Group").
STEELE is also listed as the signatory, either alone or together

with his wife Lilia Steele ("LILIA") on bank accounts opened in the name of Steele Aviation, Steele Group, and a third aviation company, Kiwijet LLC ("Kiwijet").

17.  As discussed below, it appears that STEELE's companies offer flight brokering services, which at this time do not appear to be unlawful, as well as for-hire charter flights that are unlawful because STEELE's companies lack the proper certifications under Part 135.

18.  Kiwijet is registered out of Delaware.  I requested Kiwijet's Delaware corporate records and was told that they were in the possession of a registered agent rather than the State. I have not requested these documents from the registered agent because I believe it is likely that the agent will alert STEELE or others connected with Kiwijet to this investigation.

19.  According to the Nevada Secretary of State website, which I visited on September 13, 2019, Steele Aviation is an active domestic corporation that was registered on June 23, 2003.  STEELE is listed as the President, Secretary, Treasurer, and Director.  In pending bankruptcy proceedings, Steele Aviation filed a Form 201 listing its principal place of business as the as an office building and attached hangar space located at 10700 Sherman Way, Burbank, California 91505 (the "Hangar").

20.  From financial records, I learned that there is a Chase checking account ending in 8731 in the name of Steele Aviation.  STEELE and LILIA opened the account on February 18, 2014, and STEELE provided a social security number ending in

2756.  According to the Social Security Administration, that social security number is not assigned STEELE, but is a valid number assigned to another individual.

21.  According to its website, Steele Aviation is a charter aviation company.  When I visited the webpage on October 10, 2019, text at the bottom of the webpage stated, "Steele Aviation does not own or operate 135 aircraft.  We are aviation specialists that can provide private air transportation globally 24/7 per FAA and DOT regulations."  The same day, I searched for the Steele Aviation website on The Internet Archive Wayback Machine[1] and learned that, as recently as May 24, 2018, the company homepage stated, "All charter flights are operated on our 10 or more worldwide FAA air carrier certificate M2GA869Y.  Since being issued in 1995 there has not been one violation, incident or accident."  In addition, page captures of the Steele Aviation website on May 4, 2016, at approximately 8:43 a.m., advertised, "Steele Aviation Incorporated flights are operated per FAA Part 135."

22.  According to FAA records, Steele Aviation does not hold a Part 135 Certificate.  Certificate M2GA869Y was assigned to an entity called MC Aviation, owned by LILIA.  Part 135 Certificates are not transferrable from one company to another, and the FAA revoked Certificate M2GA869Y in August 2019.  I believe the representations on the Steele Aviation website would

---

[1] According to their website, The Internet Archive Wayback Machine ("www.archive.org"), is 501(c)(3) non-profit whose mission is to build a digital library of internet sites.  They collect and store snapshots of web pages over time.

have misled customers into thinking that the FAA had certified the company to conduct for-hire passenger air transportation.

23.   According to the California Secretary of State website, which I visited on October 29, 2019, Steele Group was registered on October 8, 2018, with an address at the Hangar and STEELE listed as chief executive officer.   According to the FAA, Steele Group does not hold a Part 135 Certificate.

24.   I learned, through financial records, that STEELE also opened bank accounts for the company called Kiwijet.   The account opening applications identified Kiwijet's address as the Hangar.   According to the Kiwijet website, the company specializes in aircraft charter, aircraft acquisition, aircraft leasing, sales, and management.   Despite this, STEELE denied under oath having any affiliation with Kiwijet during a bankruptcy proceeding held on November 22, 2019.   Kiwijet also does not hold a Part 135 Certificate.

**D.   Prior FAA Investigations into Unauthorized Flights**

25.   FAA Aviation Safety Inspector David Voelker has investigated Steele Aviation and STEELE for operating numerous for-hire flights since at least 2016.

26.   From approximately April 2017 through April 2019, STEELE used a Hawker HS-125-800 with tail number N877TM, among other aircraft, to conduct for-hire flights.   Aircraft N877TM is owned by Pacific Coast Aviation ("PCA").   MC Aviation had a lease agreement for aircraft N877TM, but MC Aviation's Part 135 Certificate was not valid because neither aircraft N877TM, nor

any other aircraft, was approved by the FAA to be added to the certificate.

27.   Based on e-mails and invoices obtained from Steele Aviation customers, Inspector Voelker determined that Steele Aviation, not MC Aviation, operated for-hire flights using aircraft N877TM.  Inspector Voelker provided me a change in ownership form, dated October 28, 2016, showing the transfer from the previous owner of MC Aviation to LILIA.  The contact person listed on the form is STEELE.  Based on my training and experience, I believe STEELE purchased MC Aviation in LILIA's name because STEELE was not a U.S. citizen and could not operate under the Part 135 certificate associated with MC Aviation.

28.   The FAA inspector assigned to MC Aviation, Cotry Shearill, told me that MC Aviation made an unsuccessful attempt to add aircraft N877TM to its Part 135 Certificate.  In approximately February 2019, Inspector Shearill visited MC Aviation at the Hangar where they rent hangar space.

29.   Inspector Voelker also informed me that STEELE has evaded the FAA by purchasing blocked call signs from a third party.  These call signs allow pilots to identify their aircraft to air traffic control without using the tail number of the aircraft.  From Inspector Voelker, I learned that, on December 19, 2017 and other dates, STEELE deviated from his flight plan to avoid FAA ramp inspection.

30.   From FAA Enforcement Investigative Reports, I learned that, on March 2, 2016, FAA safety inspectors conducted a ramp inspection of a Gulfstream IV aircraft at the Van Nuys Airport.

9

Inspectors identified Christian Monthy ("MONTHY") as the pilot-in-command and STEELE as the second-in-command.  STEELE and MONTHY told the inspectors that the flight was operated under Part 91 (for private, not-for-hire flights).  The aircraft was returning from the San Jose Airport and was carrying a passenger who identified himself as P.G. and who told inspectors that his flight was arranged by his secretary and paid for by the Golden State Warriors professional basketball team.  P.G.'s attorney later told Inspector Voelker that P.G. thought Steele Aviation, was an FAA-certificated air carrier.  From P.G.'s assistant, Inspector Voelker also obtained a $9,000 quote from Steele Aviation to P.G. for a March 2, 2016 roundtrip flight from Van Nuys to San Jose.  Bank records included a cashed check from Mandalay Professional Sports, LLC, the owner of the Golden State Warriors, dated February 29, 2016, and made out to Steele Aviation for $9,000.  Inspector Voelker issued an administrative subpoena to P.G. and obtained additional quotes from Steele Aviation, and copies of corresponding checks, for the period from September 2015, through August 2016.  Inspector Voelker identified over 30 flights and more than $345,000 in compensation for those flights.

     31.  As result of this investigation, the FAA issued a civil penalty of $167,500 to Steele Aviation.  In addition, STEELE's airman's certificate was suspended for 120 days. STEELE surrendered in his airman's certificate on December 4, 2017.  The suspension was lifted on April 2, 2018.

32.   On February 9, 2018, FAA Inspectors conducted a ramp inspection of Cessna Citation aircraft with tail number N811VG arriving at Oakland airport from Hawthorne Airport.  Inspectors observed five individuals deplane.  One passenger identified himself as J.H. and told inspectors that he paid for the flight, which had been arranged by his executive assistant.  Inspector Voelker issued an administrative subpoena to J.H. and obtained copies of charter quotes, invoices, and payment information for Steele Aviation flights.  Those documents showed that Steele Aviation had conducted 16 for-hire flights paid for by J.H. or his company.

33.   On October 30, 2018, as a result of this investigation, the FAA issued a civil penalty of $624,000 to Steele Aviation.

34.   On February 14, 2019, FAA Inspectors conducted a ramp inspection of aircraft N877TM at the Boeing Field Airport in Seattle, Washington.  The flight was arriving from Victoria, British Columbia.  STEELE identified himself as the pilot-in-command, and MONTHY identified himself as the second-in-command.  STEELE told inspectors that the flight was a not-for-hire flight.  The passenger onboard identified himself as J.F. and told inspectors that the flight was arranged by his friend "Chuck" and was not for-hire.  Inspector Voelker issued an administrative subpoena to J.F.'s business and obtained invoices and records of payment for flights.  Included in the records was an invoice for a $25,000 round trip flight from Burbank, California, to Victoria, British Columbia, departing on

11

February 13, 2019, and returning on February 14, 2019.  A
February 13, 2019 e-mail from a Steele Aviation included text at
the bottom that read "Est. 1995 FAA Air Carrier: M2GA869."  I
believe that STEELE was conveying to the customer that Steele
Aviation was properly certified by the FAA.

35.  On April 26, 2019, as result of this investigation,
the FAA issued a civil penalty of $533,320 to Steele Aviation
and revoked the airman's certificates of STEELE and MONTHY.

**E.   DOT-OIG's Continuing Investigation**

36.  I reviewed STEELE's border-crossing records from U.S.
Customs and Border Protection and learned that STEELE was listed
as a crew member on N877TM on eight flights between the United
States and Canada between January 30, 2019, and February 14,
2019.

37.  Based on my review of STEELE's financial records, I
learned that J.F., and entities associated with J.F., have wired
approximately $125,000 to the Steele Aviation.  These include a
January 28, 2019 transfer of $25,000 with a memo listing J.F.'s
name and "Burbank to British Columbia," and a February 13, 2019
transfer of $25,000 with the memo, "Charter – [J.F.] 02/13-
02/14/19 Burbank, CA Victoria, BC."

38.  I also learned from financial records, that since
January 2018, customer Hoop 2 Film, LLC ("Hoop 2 Film"), wired a
total of approximately $150,000 to Chase Bank accounts in the
name of Steele Aviation and Kiwijet.  These include a $50,000
wire transfer on January 22, 2019, with a memo with the name
D.T.  Through the California Secretary of State's website, I

have identified D.T. as the manager of Hoop 2 Film.  The most recent wire transfer from Hoop 2 Film was made to Kiwijet on June 26, 2019, after the FAA had revoked STEELE's airman's certificate.

39.  Bank records indicate that, between January 31, 2018 and March 30, 2019, approximately $2,718,307 in incoming wire transfers, $690,555 in incoming checks, and $117,500 in cash deposits, have been deposited into the Steele Aviation Chase account.  At least some of these funds appear to be payments for for-hire air transportation during times when Steele Aviation lacked Part 135 Certification.  A $50,000 check dated September 10, 2018, and deposited into the Steele Aviation Chase account had a memo that read "Air Travel."  A $150,000 wire transfer into the Steele Aviation Chase account and dated September 25, 2018, had a memo that read "Private Jet Re: October 2018 US Tour."

40.  Between January 2018 and August 2019, STEELE paid MONTHY approximately $91,480.  The most recent payment to MONTHY was on August 26, 2019, for $3,800 -- after the FAA revoked both STEELE and MONTHY's airman's certificates.

41.  From January 2018 through November 2019, STEELE deposited approximately $452,192 cash into the accounts of Steele Aviation, Steele Group, and Kiwijet, often in amounts just under $10,000.  Based on my training and experience, these deposits are consistent with "structuring" transactions below the $10,000 threshold that triggers federal reporting requirements.  I believe that STEELE structured these

transactions to hide violations of the Subject Offenses, such as Kiwijet conducting unlawful for-hire passenger operations.

**F.    Interview with Former MC Aviation Employee**

42.    On August 27, 2019, Assistant Special Agent in Charge Brendan Culley and I interviewed M.B., who was employed as the Director of MC Aviation from approximately late 2016 through late 2017.  M.B. was hired to update the manuals for MC Aviation so that the Part 135 Certificate would be in compliance with federal regulations.

43.    M.B. stated that he stopped working for STEELE when things started to get "sketchy."  M.B. witnessed passengers boarding the Hawker-800 and the Cessna Citation.  M.B. felt that something was not right with the situation and further stated that he was aware STEELE operated a second company called Steele Aviation.  In M.B.'s opinion, it would not have been proper for STEELE to fly passengers and charge them because there was no valid Part 135 certificate.  M.B. believed that STEELE was aware that operating for-hire flights would have been improper.

44.    M.B. also stated that he worked for STEELE at the Hangar.  According to M.B., aircraft maintenance records, pilot records, manuals, certificates were stored on shelves at the Burbank office.  The office suite was large and had private offices.  M.B. used a desktop computer in the office.  M.B. saw also additional desktop computers in the office.

### G.   STEELE Leaves the Hangar

45.   On July 29, 2019, I visited the Hangar and saw that approximately six parking stalls across from the front door had signs that read "reserved for Steele Aviation."

46.   On October 11, 2019, I called Atlantic Aviation and indicated that I wanted to deliver a package to Steele Aviation. A representative confirmed that Steele Aviation was a tenant and stored their aircraft there.

47.   On November 19, 2019, FAA Inspector Voelker informed me that he had learned from the general manager at Atlantic Aviation that the Hangar was being emptied.

48.   On November 25, 2019, I visited Atlantic Aviation and spoke to a customer service manager, who informed me that STEELE was still a tenant.  I noticed that the parking stalls in front of the Hangar, which were previously marked "Reserved for Steele Aviation," appeared to have had the name "Steele" removed and were only marked as "Reserved for Aviation."

49.   On December 17, 2019, I visited Atlantic Aviation and noticed that the parking stall signs were no longer there.  DOT-OIG Special Agent Paolo Hernandez called Atlantic Aviation and a female employee told him that Steele Aviation was no longer a tenant.

### H.   STEELE Relocates to the SUBJECT PREMISES

50.   A law enforcement database search for STEELE identified the SUBJECT PREMISES as an address associated with STEELE.  The most recent owner of the SUBJECT PREMISES was listed as STEELE's wife, LILIA.

51.  On February 4, 2020, the Honorable Alka Sagar, United States Magistrate Judge, signed a warrant in case number 2:20-MJ-00486, authorizing the installation and use of a tracking device on STEELE's vehicle, a 2018 Mercedes S63, California license plate 8FJU292, vehicle identification number WDDUG8JBOJA422783. An extension for the tracking device was signed by the Honorable John E. McDermott on March 25, 2020, and a second extension for the tracking device was signed by the Honorable Gail J. Standish on May 8, 2020.

52.  Agents installed the GPS tracking device on February 12, 2020, but the battery on the tracking device died, and, on or about March 2, 2020, the tracker stopped working.

53.  In an attempt to recover the GPS tracking device, agents conducted surveillance at the SUBJECT PREMISES on March 10, 2020, April 24, 2020, May 4, 2020, May 7, 2020, and June 9, 2020.  On each occasion, agents saw STEELE at the SUBJECT PREMISES.  However, agents were unable to remove the GPS tracker until June 9, 2020, because STEELE rarely left the SUBJECT PREMISES.  When STEELE did leave, he drove in an unpredictable manner that, in my training and experience, was consistent with counter-surveillance.

a.  On March 10, 2020, STEELE failed to stop at a stop sign and drove at a high rate speed.  Once agents caught up with STEELE, he made a U-turn to enter the 101 Freeway.

b.  On May 6, 2020, agents attempted to follow STEELE northbound on Reseda Boulevard.  STEELE stopped at red light,

but, once the light turned green, STEELE drove away at a high rate of speed and made a hard right turn onto Burbank Boulevard.

54.   Using the GPS tracking device and physical surveillance, I could not identify a new business location for STEELE.  Based on my training and experience, and knowledge of this investigation, I believe that STEELE has begun operating Kiwijet from the SUBJECT PREMISES.

**I.   STEELE Operates Kiwijet from the SUBJECT PREMISES**

55.   On February 4, 2020, the Honorable Alka Sagar, United States Magistrate Judge, signed a warrant in case number 2:20-MJ-00491, for the content of Google accounts "sales@kiwijet.com" and "ns@kiwijet.com."  Based on my review of the accounts, I learned the following:

a.   E-mails sent from both "sales@kiwijet.com" and "ns@kiwijet.com" often contained text at the end of the e-mails that read, "FAA/DOT Worldwide 135 Air Carrier Operations."  I believe this was to make the recipient of the e-mails believe that Kiwijet was an aviation company that held a Part 135 Certificate.  E-mails from account "ns@kiwijet.com" were often signed by "Nicolas Steele Founder/CEO/President."

b.   In an e-mail dated September 30, 2019, "Mike Ryan, Operations Manager" inquired with T.P., regarding hangar space for rent.  "Mike Ryan" indicated that Kiwijet had "4 GIVs, 1 Global 500, 1 EMB 100, and 1 Hawker 800," which refer to types of aircraft.  I also found e-mails in which "Mike Ryan" or "Sara" inquired with third parties about aircraft for sale.  The most recent inquiry occurred on January 27, 2020.  Based on this

17

information, I believe STEELE has attempted to find new aircraft and hangar space to continue his illegal charter operation.

c.   Many of the e-mails sent from the account "sales@kiwijet.com" were signed by "Mike Ryan," "Sara," or "Kiwijet Sales Team."  Based on my review of Kiwijet bank records, I have not seen records of any payments to employees or individuals named "Mike" or "Sara."  I also did not find any e-mails from STEELE to any individuals named Mike or Sara, as would be expected if STEELE were the president of Kiwijet and Mike and Sara were his employees.  Based on my training, experience and knowledge of this investigation, the names "Mike Ryan" and "Sara" are pseudonyms for STEELE and/or LILIA, who continue to run Kiwijet from the SUBJECT PREMISES.

d.   I also found e-mail invoices dated from in or about November 2019, through February 2020, from Premier Workspaces.  These appear to be seeking rent for virtual office space at 9701 Wilshire Boulevard, Suite 1032, Beverly Hills, CA 90212. Premier Workspaces e-mailed STEELE regarding past due rent payments for November 2019, December 2019, and January 2020.  STEELE ultimately made the past due rent payments via e-mail using a credit card.  Based on surveillance and my review of the GPS tracking data, it does not appear that STEELE visits the space at 9701 Wilshire Blvd, Suite 1032, Beverly Hills, CA 90212.

e.   The e-mails further show that "Mike Ryan" entered into agreements with the other aviation companies to complete trips for Kiwijet customers.  Attached to an e-mail dated

November 29, 2019, "Mike" sent the company Silver Air a signed agreement for a trip from Puerto Vallarta, Mexico, to Van, Nuys, California, set to occur on December 1, 2019.  The agreement included details indicating that "Mike Ryan" signed the agreement electronically on November 28, 2019, from IP address 76.91.3.254.  I subpoenaed Charter Communications and learned that IP address 76.91.3.254 is an IP address associated with the SUBJECT PREMISES, under customer name Blanca Costello.  I am unaware whether Blanca Costello is a real person and, if so, the nature of her relationship with STEELE.

56.  On December 3, 2019, I spoke to J.S., Vice President of Sales for company Jet Ready, a Part 135 air carrier.  J.S. said that in October and November 2019 Jet Ready retained Kiwijet to complete two trips.  J.S.'s contact at KiwiJet was an individual who identified himself as "Mike" and who told J.S. that Kiwijet was a Part 135 operator. Jet Ready wired Kiwijet a total of $120,850 for the two trips that were set to take place on a Gulfstream IV with tail number N511KA.  Based on border crossing records, STEELE was previously listed as a crew member aboard aircraft N511KA on a trip in November 2018.  According to J.S., Kiwijet cancelled about four days before the first trip was scheduled.  Kiwijet has not returned any money to Jet Ready after numerous requests.

57.  On February 21, 2020, Special Agent Paolo Hernandez and I interviewed G.S., Vice President of Charter Sales for aviation company Jet Edge.  G.S. said that in January 2020, Jet Edge completed a trip for Kiwijet from Grand Junction, Colorado

to Oakland, California.  The night before the flight, Jet Edge received a wire confirmation from Kiwijet via e-mail for $34,000 as payment for the trip.  However, the wire was never received by Jet Ready.  The Jet Edge accounting team noticed the routing number was incorrect in the wire confirmation.  The contract between Kiwijet and Jet Edge was signed by "Mike Ryan," and therefore G.S. was not aware of STEELE's involvement with Kiwijet until after the trip was completed.  G.S. stated that he/she has experienced similar issues with STEELE in the past.

58.  I saw the e-mail with the wire confirmation to Jet Edge.  The confirmation appeared to show a wire for $34,000 from a business checking account ending in 2222 to a Jet Edge account ending in 6376.  Based on my review Kiwijet financial records, I learned that the account ending in 2222 had an ending daily balance of -$204.11 on the day the email was sent.  In addition, I did not see any attempted wire transfers for that date in the account records.  I believe that STEELE created this wire confirmation to ensure that Jet Edge would complete the trip knowing that the Kiwijet account had insufficient funds.

59.  Based on surveillance of the SUBJECT PREMISES, e-mails showing that STEELE engaged in the aviation business after November 2019, and the fact that "Mike Ryan" electronically signed documents from an IP address associated with the SUBJECT PREMISES, I believe that STEELE has continued to run his operation from the SUBJECT PREMISES while he attempts to secure additional aircraft and potentially new hangar space.  Based on

my training and experience, I believe that records previously stored in the Hangar were likely moved to the SUBJECT PREMISES.

**J.   STEELE Currently Resides at the SUBJECT PREMISES**

60.   Based on open source research, I recently learned that the SUBJECT PREMISES was in foreclosure and auctioned on June 24, 2020.  At this time, I am unaware if or when STEELE must vacate the SUBJECT PREMISES.

61.   On July 7, 2020, I confirmed with a security guard at the entry gate of the gated community in which the SUBJECT PREMISES is located, that STEELE continues to reside in the community.  I also conducted surveillance at the SUBJECT PREMISES, where I saw gardeners servicing the lawn and a child's bike and scooter in the side yard.  In previous instances of surveillance, I have seen STEELE with school-aged children at the SUBJECT PREMISES.

**V.   TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES**

62.   Based on my training and experience and information I have obtained from other law enforcement officers, I know the following:

a.   I am aware that persons who operate charter flights without a proper Part 135 certification may do so as part of a criminal conspiracy to obtain financial gain from illegal jet carrier operations, in disregard of FAA safety regulations.

b.   Persons who operate a carrier without the proper certification often make false statements in furtherance of the conspiracy, including misrepresenting to customers, owners of

leased aircraft, and insurance providers that the carrier is properly certified.  Persons who operate a carrier without the proper certification also maintain records that are false or incomplete for the purposes of displaying such records to FAA examiners upon inspection.  Illegal carrier operations often employ uncertified or improperly certified pilots, do not conduct the maintenance required under Part 135, do not keep the records required under Part 135, and do not operate flights with necessary safety precautions required under Part 135.

c.   Offenders often keep records of their illegal activities for a lengthy period of time extending substantially beyond the time during which they produce, market, sell, and profit from their crimes.

d.   Offenders commonly maintain hard copy and computer files, books, records, receipts, notes, ledgers, journals, diaries, address books, and other various materials and documents relating to their crimes.  These materials can include flight records, advertising materials, communications with passengers and prospective passengers, records relating to pilot certifications, records related to the operations, aircraft, and business, and records related to FAA inspections. More specifically, records may include originals or copies of invoices, accounts payable, accounts receivable, operating certificates including operations specifications, aircraft lists, and individual pilot records, and load manifests.

e.   Offenders who commit fraud often possess evidence, fruits, and instrumentalities relating to such

22

offenses on their person, including in digital devices, and in their places of business including office space, hangars, and vehicles.  It has been my experience that offenders possess storage safes, computers, and cell phones and use them as part of their method of operation. Offenders also store records such as maintenance/inspection records, fuel records, flight plans and medical records for pilots and other records relevant to the operation of the aircraft in aircrafts and other vehicles.

f.    Offenders who commit fraud often request and receive cash payments in order to hide the illicit nature of their transactions.  Offenders then deposit cash into their bank accounts in amounts under $10,000 in an attempt to avoid federal reporting requirements.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

63.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally,

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

24

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

64.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

65.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress STEELE's thumb- and/or fingers on the

device(s); and (2) hold the device(s) in front of STEELE's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

66. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

67. For all of the reasons described above, there is probable cause to believe that evidence of the Subject Offenses, as described in Attachment B, will be found in a search of the SUBJECT PREMISES, as described in Attachment A-1, and on the person of STEELE, as described in Attachment A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
July, 2020.


_____
HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE